## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTINE REYNOLDS, as parent and
natural guardian for M.M., a minor;
CHRISTINE REYNOLDS, in her own
right,

                Plaintiffs,

     v.

PBG ENTERPRISES, LLC; PERRY
GALLESE; DELAWARE COUNTY
HOUSING AUTHORITY,

                Defendants.

Civil Action
No. 10-4373

Pollak, J.                                                            July 6, 2011

### OPINION

    This action involves a suit brought by plaintiff Christine Reynolds on behalf of her

minor child, M.M., and in her own right against defendants PBG Enterprises, LLC

("PBG"), Perry Gallese ("Gallese"), and the Delaware County Housing Authority

("DCHA").  Before the court is DCHA's motion to dismiss the amended complaint.

Plaintiffs (collectively "Reynolds") oppose the motion.  For the reasons that follow, the

court will grant the motion to dismiss.

**I.      Facts**

    As alleged in the amended complaint, Christine Reynolds and her son M.M.

resided at 208 N. 6th St., Darby, Pennsylvania, from about May 1, 2004, until at least

August 29, 2008.[1]  They leased the apartment from defendants Gallese and PBG pursuant

to the Section 8 voucher program[2] through the United States Department of Housing and

Urban Development and the Delaware County Housing Authority voucher program.  The

lease was between only Reynolds and PBG, and there was a second, separate contract

between DCHA and PBG for the housing subsidy.

M.M. is alleged to have been "exposed to a defective, dangerous and hazardous

condition of the property, lead paint."  (Am. Compl. ¶ 15.)  It is alleged that the exposure

was "ongoing . . . while the Plaintiffs were present within and about the [apartment]

premises."  (Am. Compl. ¶ 27.)  As a result, M.M. had "abnormally high level[s] of lead

exposure and sought medical treatment because of abnormal behavior and cognitive

responses."  (Am. Compl. ¶ 25.)  It is alleged that M.M. was exposed to and ingested lead

---

[1] The only date referenced in the amended complaint concerning the events at issue is August 29, 2008, presumably for statute of limitations purposes.  (Am. Compl. ¶ 15.) Other dates discussed in this opinion are gleaned from the lease agreement included as an exhibit to DCHA's motion to dismiss (Docket No. 13, ex. A (Lease Agreement)), and relied upon in the amended complaint (Am. Compl. ¶ 16).  *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").  Ultimately, the precise date of the events is immaterial to the resolution of this matter.

[2] "The federal Section 8 rental assistance program provides rent subsidies for low- and moderate-income participants so that they can afford to lea[s]e privately owned housing units.  It was established under the United States Housing Act of 1937. . . . [T]enant-based assistance provides a participant with a voucher which may be used at any eligible unit."  *Massie v. U.S. Dep't of Hous. & Urban Dev.*, 620 F.3d 340, 342 n.2 (3d Cir. 2010) (citations omitted) (internal quotation marks omitted).

paint and thereby "suffered severe and painful bodily injuries including, but not limited to high levels of lead toxicity requiring chelation therapy, abnormal behavior, cognitive injuries, brain damage, hyperactivity, loss of appetite, excitability, attention deficits and diminished IQ." (Am. Compl. ¶ 29.) These injuries are alleged to have occurred "throughout the tenancy as a result of the ongoing exposure to the toxic lead substances." (Am. Compl. ¶ 26.)

Reynolds alleges that the defendants "should have know[n] that there existed a hazardous and defective condition of lead paint on the premises which would endanger the health and welfare of Plaintiffs." (Am. Compl. ¶ 24.) Reynolds further alleges that DHCA "was required to inspect the premises to ensure that it complied at all times with [federal housing and lead paint laws]" and "failed to notify the landlord of the premises and to take any remedial action to remove the defective and hazardous condition from the premises before minor Plaintiff [M.M.] was injured." (Am. Compl. ¶ 20.)

Reynolds initiated this action on August 27, 2010, against all defendants for the injuries suffered by M.M. DCHA filed a motion to dismiss the complaint, and in response, Reynolds filed an amended complaint (Docket No. 12) on October 28, 2010, against the same defendants. The following claims are asserted against DCHA in the amended complaint,[3] which fall into four general categories:

---

[3] Claims for negligence, strict liability, negligent infliction of emotional distress, breach of contract, and loss of consortium—all state law claims—were also asserted against Gallese and PBG, but they are not addressed at this time because those defendants

A. State law torts:
    (1) Negligence (Count III, Am. Compl. ¶¶ 48–56);
    (2) Strict Products Liability (Count IV, Am. Compl. ¶¶ 57–65);
    (3) Strict Liability—Ultra Hazardous Activity (Count VII, Am. Compl. ¶¶ 79–82);
    (4) Intentional infliction of emotional distress (Count XV, Am. Compl. ¶¶ 187–91);
    (5) Loss of consortium (Count XVIII, Am. Compl. ¶¶ 205–06);
B. State law breach of contract (Count XVII, Am. Compl. ¶¶ 200–04);
C. 42 U.S.C. § 1983 liability:
    (1) United States Housing Act (Count VIII, Am. Compl. ¶¶ 83–97);
    (2) Lead-Based Paint Poisoning Prevention Act (Count IX, Am. Compl. ¶¶ 98–110);
    (3) Residential Lead-Based Paint Hazard Reduction Act (Count X, Am. Compl. ¶¶ 111–23);
    (4) Fifth and Fourteenth Amendments (Counts IX & X, Am. Compl. ¶¶ 100, 113);
D. Direct private rights of action:
    (1) United States Housing Act (Count XI, Am. Compl. ¶¶ 124–43);
    (2) Lead-Based Paint Poisoning Prevention Act (Count XII, Am. Compl. ¶¶ 144–62);
    (3) Residential Lead-Based Paint Hazard Reduction Act (Count XIII, Am. Compl. ¶¶ 163–81).

The relief requested by Reynolds on all claims asserted against DCHA is money damages.

DCHA filed a motion to dismiss the amended complaint, which Reynolds opposes. (Docket Nos. 13, 17.) DCHA filed a reply, and Reynolds a surreply. (Docket Nos. 18, 23.)

## II. Legal Standard for Motion to Dismiss

A district court must conduct a two-part analysis when presented with a motion to dismiss for failure to state a claim. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d

_____

have not filed a motion to dismiss.

Cir. 2009). First, a district court must separate the factual and legal elements of a claim, taking all of the complaint's well-pleaded facts as true, but disregarding any legal conclusions. *Id.* at 210–11. Second, the district court must determine whether the facts alleged in the complaint "show" that the plaintiff is entitled to relief. *Id.* at 211. The district court should "draw on its judicial experience and common sense" to determine whether the well-pleaded facts "show" a plausible claim for relief. *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).

## III.    Discussion

Reynolds brings a litany of claims against DCHA pursuant to both federal and state law.[4] The court will examine the claims in the following order: (1) federal statutory claims; (2) federal constitutional claims; and (3) state law claims.

### A.    Federal statutory claims

Plaintiffs here assert federal claims both through § 1983 and through private rights of action, claiming personal rights[5] stemming from various federal statutes. In particular, plaintiffs claim that DCHA is liable for violations of: (1) the Lead-Based Paint Poisoning

---

[4] The court exercises jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367. There is no basis for diversity jurisdiction over the state law claims, as the plaintiffs and at least one defendant (DHCA) are citizens of Pennsylvania.

[5] "Courts have been inconsistent in the terms they use to refer to 'personal rights,' sometimes calling them 'individual rights,' 'private rights,' or simply 'federal rights.' We use the term 'personal rights' throughout this opinion to maintain the demarcation between 'personal rights' and 'private rights of action.'" *Three Rivers Ctr. for Indep. Living, Inc. v. Hous. Auth. of Pittsburgh*, 382 F.3d 412, 419 n.9 (3d Cir. 2004).

Prevention Act (LBPPPA), 42 U.S.C. §§ 4821, 4822; (2) the Residential Lead-Based

Paint Hazard Reduction Act (RLBPHRA), 42 U.S.C. § 4852–56; and (3) the United

States Housing Act (USHA), 42 U.S.C. §§ 1437–1437bbb-9. For plaintiff to assert a

federal cause of action through § 1983 or through an implied private right of action, the

court must first address a threshold question: do these statutes confer personal rights upon

plaintiffs?[6]

The Supreme Court has explained that this inquiry is the same whether the court is

analyzing the claim through the lens of § 1983 or as an implied private right of action:

"we . . . reject the notion that our implied right of actions cases are separate and distinct

from our § 1983 cases. . . . [T]he inquiries overlap in one meaningful respect—in either

case we must first determine whether Congress *intended to create a federal right*."

*Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (emphasis in original). Moreover, "'a

plaintiff must assert the violation of a federal *right*, not merely a violation of federal

---

[6] Reynolds also cites to huge swaths of the Code of Federal Regulations, without any reasonable specificity, as sources of personal rights enforceable either through § 1983 or through a private right of action. (*See* Am. Compl. ¶ 89 (citing generally to entire parts and subparts of the C.F.R. consisting of well over one hundred individual sections).) Regulations, however, do not independently create actionable personal rights where the organic statute does not, and thus, the regulations cited by Reynolds will not be considered in the inquiry that follows. *See Alexander v. Sandoval*, 532 U.S. 275, 284 (2001) ("[R]egulations, if valid and reasonable, authoritatively construe the statute itself, and it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute." (citations omitted)); *Three Rivers Ctr.*, 382 F.3d at 424 ("[A] regulation cannot create a right enforceable through section 1983 where the alleged right does not appear explicitly in the statute, but only appears in the regulation." (internal quotation marks omitted)).

law.'" *Id.* at 282 (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)) (emphasis in original). "Accordingly, it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced." *Id.* at 283. The *Gonzaga* court concluded by noting: "We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Id.*

In determining whether a statute creates personal rights, a court must determine "whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Id.* at 285. "[I]f Congress wishes to create new rights . . ., it must do so in clear and unambiguous terms." *Id.* at 290. "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). "Accordingly, where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Gonzaga*, 536 U.S. at 286.

From these and other Supreme Court pronouncements, the Court of Appeals for the Third Circuit has recognized two general propositions with respect to the creation of personal rights by federal statutes:

> First, Congress may effect its legislative goals through various means. Congress sometimes legislates by innuendo, for example, making declarations of policy and indicating a preference while requiring measures that, though falling short of legislating its goals, serve as a nudge in the preferred

directions. Other times, Congress more specifically creates rights and obligations.

Second, Congress can create various types of rights and obligations. And one subset of rights that courts have discerned in statutes is personal rights. Personal rights inhere in the individual; they are individually focused; they create individual entitlements. Non-personal rights, by contrast, often have a systemwide or aggregate focus; are defined in terms of the obligations of the person or entity regulated rather than in terms of entitlements of the individual protected; are not concerned with whether the needs of any particular person have been satisfied; and regard institutional policy and practice, not individual instances of conduct.

To be sure, systemic legislation may in fact benefit a group of individuals. That does not mean that the legislation confers a federal right on those individuals. The question whether a statute is intended to benefit particular plaintiffs is quite different from the question whether the statute in fact benefits those plaintiffs. Personal rights are those intentionally and unambiguously conferred through rights-creating language.

*Three Rivers Ctr. for Indep. Living, Inc. v. Hous. Auth. of Pittsburgh*, 382 F.3d 412, 419–20 (3d Cir. 2004) (alterations, footnotes, citations, and internal quotation marks omitted). With that in mind, plaintiffs' claims of personal rights under the LBPPPA, RLBPHRA, and USHA will be examined to determine whether the statutes created new individual rights in "clear and unambiguous terms."[7]

---

[7] Plaintiffs rely on a number of pre-*Sandoval* and pre-*Gonzaga* cases in their opposition (*see* Docket No. 17 at 10–18), but those cases are inapposite for two reasons. First, the cases do not conduct the inquiry required by *Sandoval* and *Gonzaga*, namely, whether Congress has clearly and unambiguously conferred a personal right upon plaintiffs, as opposed to a mere benefit. Second, the cases by and large do not address whether plaintiffs have personal rights, but focus instead on the separate inquiry of whether the plaintiffs had a vehicle through which to assert personal rights, be it § 1983 or an implied private right of action. Here, the court is principally concerned with whether there are personal rights to enforce.

### 1.     LBPPPA

The two sections of the LBPPPA cited in plaintiff's amended complaint are 42

U.S.C. §§ 4821 and 4822.  Section 4821 details the legislative goals and general scope of

the act:

> (a) The Secretary of Housing and Urban Development, in consultation with the Secretary of Health and Human Services, shall develop and carry out a demonstration and research program to determine the nature and extent of the problem of lead based paint poisoning in the United States, particularly in urban areas, including the methods by which the lead based paint hazard can most effectively be removed from interior surfaces, porches, and exterior surfaces of residential housing to which children may be exposed.

> (b) The Chairman of the Consumer Product Safety Commission shall conduct appropriate research on multiple layers of dried paint film, containing the various lead compounds commonly used, in order to ascertain the safe level of lead in residential paint products. No later than December 31, 1974, the Chairman shall submit to Congress a full and complete report of his findings and recommendations as developed pursuant to such programs, together with a statement of any legislation which should be enacted or any changes in existing law which should be made in order to carry out such recommendations.

42 U.S.C. § 4821.  These provisions direct various government officers to conduct

research on "the problem of lead based paint poisoning in the United States" and to report

to Congress the results of such research.  Section 4822 goes into more detail on how the

particular procedures to effectuate the LBPPPA would be implemented:

> The Secretary of Housing and Urban Development (hereafter in this section referred to as the "Secretary") shall establish procedures to eliminate as far as practicable the hazards of lead based paint poisoning with respect to any existing housing which may present such hazards and which is covered by an application for mortgage insurance or housing assistance payments under a program administered by the Secretary or otherwise receives more than $5,000

in project-based assistance under a Federal housing program. Beginning on January 1, 1995, such procedures shall apply to all such housing that constitutes target housing, . . . and shall provide for appropriate measures to conduct risk assessments, inspections, interim controls, and abatement of lead-based paint hazards.

42 U.S.C. § 4822(a)(1). Subsections (a)(1)(A)–(G) provide minimum procedures, which include disclosure pamphlets to purchasers and tenants, periodic risk assessments and inspections for certain types of renovations or rehabilitations, and provision of notice to occupants. The statute further directs the Secretary to "require the inspection of all intact and nonintact interior and exterior painted surfaces of housing subject to this section for lead-based paint" as well as "require abatement of lead-based paint and lead-based paint hazards in [public] housing in which the test results equal or exceed the standard established by or under subsection (c) of this section." *Id.* § 4822(c), (d)(1).

The language of the LBPPPA does not clearly and unambiguously create personal rights in tenants of Section 8 housing like plaintiffs here. Although undoubtedly such tenants are intended *beneficiaries* of the LBPPPA, Congress did not use language that confers personal rights on those beneficiaries. The statute speaks in terms of the "the person regulated rather than the individuals protected," and thus, "creates 'no implication of an intent to confer rights on a particular class of persons.'" *Sandoval*, 532 U.S. at 289 (quoting *California v. Sierra Club*, 451 U.S. at 294). Instead of focusing on individuals and conferring rights on them, the statute "speaks only in terms of institutional policy and practice" with an "'aggregate' focus" that is "not concerned with 'whether the needs of

10

any particular person have been satisfied," and thus, "cannot 'give rise to individual rights.'" *Gonzaga*, 536 U.S. at 288 (quoting *Blessing*, 520 U.S. at 343–44).

Although the Court of Appeals for the Third Circuit has not yet addressed this issue,[8] the Court of Appeals for the Sixth Circuit reached the same conclusion in *Johnson v. City of Detroit*, 446 F.3d 614 (6th Cir. 2006). Reviewing the same statutory language cited by plaintiffs here, the *Johnson* court concluded that "the text and overall structure of the statute focuses on the regulating entity's duties, which is too far removed from the interests of individual tenants to confer the kind of individual entitlement that is enforceable . . . in accordance with *Gonzaga*." *Id.* at 625. This court agrees with that assessment and will dismiss the LBPPPA claims.

### 2.  RLBPHRA

Plaintiffs' next claim of a personal right is grounded in the RLBPHRA, 42 U.S.C. §§ 4851–56. The RLBPHRA has fifteen separate sections among its four subchapters, but the amended complaint cites specifically to sections 4851 and 4852 only, and at other times it cites generally to the entire statute without any specificity at all. (*See, e.g.*, Am.

---

[8] The closest the Third Circuit has been to the issue was the case of *Davis v. Philadelphia Housing Authority*, 121 F.3d 92, 94 (3d Cir. 1997), but the court there expressly limited its holding to the standing issue before it, and not the "analytically distinct" but "related question of whether the [LBPPPA] provides Section 8 participants or their successor tenants with either an express or implied cause of action against the Housing Authority for an alleged breach of its duties to inspect for lead-based hazards and to ensure the removal of such hazards in apartment units which are, or at some time were, part of the Section 8 program."

Compl. ¶¶ 1, 9, 120.)  Section 4851 of the RLBPHRA speaks generally as to the

Congressional findings undergirding the act, but does not have any operative

language—it is merely a list of findings.  Section 4852, for its part, authorizes the

Secretary "to provide grants to eligible applicants to evaluate and reduce lead-based paint

hazards in housing that is not federally assisted housing, federally owned housing, or

public housing."  Both sections are nothing more than "declarations of policy . . .

indicating a preference," and neither contains clear and unambiguous text conferring

personal rights.  *Three Rivers Ctr.*, 382 F.3d at 419.

 Looking to the balance of the RLBPHRA, the only subsection that might confer a

personal right on plaintiffs is § 4852d.  That section requires lead warning statements,

disclosures, and pamphlets to be furnished by "the seller or lessor" to "the purchaser or

lessee" as well as a 10-day period to permit a risk assessment or inspection for the

presence of lead-based paint hazards.  42 U.S.C. § 4852(a)(1)(A)–(C), (2), (3).  It also

provides a statutory remedy for purchasers and lessees if the disclosure obligations are not

met: "Any person who knowingly violates the provisions of this section [4852d] shall be

jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the

amount of damages incurred by such individual."  42 U.S.C. § 4852d(b)(3).

 Even assuming that this language confers private rights upon Reynolds as a lessee,

however, there are three problems that scuttle plaintiffs' claim.  First, to the extent that

plaintiffs assert a § 1983 cause of action, the existence of an express remedy for

violations of the statute's disclosure requirements forecloses recourse to § 1983. *See*

*Blessing*, 520 U.S. at 346–48 (holding that a remedial scheme will typically be

"sufficiently comprehensive to supplant § 1983" if it contains a private remedy for

aggrieved persons); *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453

U.S. 1, 23 (1981) ("We therefore conclude that the existence of these express remedies

demonstrates . . . that Congress . . . intended to supplant any remedy that otherwise would

be available under § 1983."); *Three Rivers Ctr.*, 382 F.3d at 422 (holding that § 1983

remedy may be unavailable if Congress "creat[ed] a comprehensive enforcement scheme

that is incompatible with individual enforcement under § 1983" (internal quotation marks

omitted)); *accord L.B. III v. Hous. Auth. of Louisville*, 345 F. Supp. 2d 725, 730 (W.D.

Ky. 2005) (holding that the RLBPHRA remedy foreclosed § 1983 action). Second,

Reynolds may not sue on M.M.'s behalf because any right in the statute is conferred on

only "lessees" or "purchasers," not simply residents. *See Mason ex rel. Heiser v.*

*Morrisette*, 403 F.2d 28, 31–32 (1st Cir. 2005) (holding that minor children of lessees do

not have standing to sue under 42 U.S.C. § 4852d(b)(3)); *L.B. III*, 345 F. Supp. 2d at 729

("[T]he RL[B]PHRA lacks rights-creating language for residents, choosing instead to

confer unambiguous rights only upon purchasers and lessees."). Third, to the extent that

Reynolds may sue in her own right under the statute's express remedy, she has no cause

of action against DCHA because any obligations imposed by the RLBPHRA are imposed

only on "sellers" and "lessors," and DCHA does not fall within either category, as the

undisputed lease shows that the lessor is PBG, not DCHA.[9]  (*See* Docket No. 13, ex. A

(Lease Agreement); Am. Compl. ¶ 20 (distinguishing between DCHA and the landlord).)

Therefore, even assuming that the RLBPHRA confers enforceable rights upon

Reynolds, the amended complaint fails to state a claim upon which relief can be granted

because plaintiffs cannot sue DCHA for the alleged violations of the statute under either

§ 1983 or through the statute's own express cause of action.  The RLBPHRA claims will

be dismissed.

### 3.    USHA

Plaintiffs' third claim of personal rights is grounded in the USHA, 42 U.S.C.

§§ 1437–1437bbb-9.  The USHA is comprised of more than 55 sections of the United

States Code, but plaintiffs have not identified any specific section of the USHA other than

§ 1437 or "§ 1437 *et seq.*" in their claims against DCHA.  (*See* Am. Compl. ¶¶ 1, 9, 18,

50(f), 88, 125, 126, 128, 147, 166.)

Perhaps plaintiffs wish to rely only on § 1437, as it is the only section of the

USHA specifically identified in their complaint; perhaps plaintiffs wish to assert claims

pursuant to § 1437f, the statutory source for the Section 8 program; perhaps they wish to

assert claims pursuant to § 1437d(f), which sets forth "housing quality requirements" for

---

[9] Although there is a Section 8 voucher contract between DCHA and PBG, this
contract established only the obligations between PBG and DCHA.  (*See* Docket No. 13,
ex. A at 6–15 (Section 8 voucher contract between PBG and DCHA).)  Like the lease
itself, this contract undergirds claims made in the amended complaint (Am. Compl. ¶ 16),
and may be properly considered, *Pension Benefit Guar. Corp.*, 998 F.2d at 1996.

certain public housing; or perhaps plaintiffs with to rely on some other part of the USHA—the court simply cannot tell from the amended complaint. Plaintiffs must do more than cite large chunks of the United States Code to establish the existence of a personal right. Given the absence of precise statutory citations to the USHA in the amended complaint, the court can only conclude that (construing the amended complaint quite liberally) plaintiffs wish to assert their rights pursuant to sections 1437, 1437f, and 1437d(f) to recover for the alleged lead-based paint injuries.

Unfortunately for plaintiffs, none of these sections clearly and unambiguously confer a personal right upon them. Section 1437 is just a broad declaration of policy:

It is the policy of the United States—

(1) to promote the general welfare of the Nation by employing the funds and credit of the Nation, as provided in this chapter—

> (A) to assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families;

> (B) to assist States and political subdivisions of States to address the shortage of housing affordable to low-income families; and

> (C) consistent with the objectives of this subchapter, to vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration, with appropriate accountability to public housing residents, localities, and the general public;

(2) that the Federal Government cannot through its direct action alone provide for the housing of every American citizen, or even a majority of its citizens, but it is the responsibility of the Government to promote and protect the independent and collective actions of private citizens to develop housing and

strengthen their own neighborhoods;

(3) that the Federal Government should act where there is a serious need that private citizens or groups cannot or are not addressing responsibly; and

(4) that our Nation should promote the goal of providing decent and affordable housing for all citizens through the efforts and encouragement of Federal, State, and local governments, and by the independent and collective actions of private citizens, organizations, and the private sector.

42 U.S.C. § 1437(a). The language here states aspirational goals, but it does not specifically create rights and obligations. It is devoid of rights-creating language.

Similarly, § 1437f does not contain clear and unambiguous rights-creating language in its various subsections (which require forty pages of the United States Code Annotated to spell out). The best the court is able to marshal in support of plaintiffs' claim of deficient inspection (seeing as plaintiffs have not raised § 1437f on their own) is subsection (o)(8), which governs the "[i]nspection of units by PHAs [public housing authorities]." 42 U.S.C. § 1437f(o)(8). The provisions of subsection (o)(8), however, focus on the conduct of public housing agencies as regulated by the Secretary and do not enumerate rights of tenants in the housing that is to be inspected. *See, e.g.*, *id.* § 1437f(o)(8)(A) ("[T]he public housing agency shall inspect the unit . . . ."), (B) ("The housing quality standards under this subparagraph are standards for safe and habitable housing established . . . by the Secretary . . . ."), (C) ("[A]n inspection of the dwelling unit [must be] conducted before any assistance payment is made for the unit."), (D) ("Each public housing agency providing assistance under this subsection . . . shall make an

16

annual inspection of each assisted dwelling unit . . . ."), (E) ("The Secretary shall establish procedural guidelines and performance standards . . . .").  Instead of language speaking of obligations to individuals and creating personal rights, the statute speaks only to the housing agencies' obligations pursuant to standards set by the Secretary of Housing and Urban Development.  This is not enough to create personal rights enforceable through § 1983 or through a private right of action.

Likewise, § 1437d(f) generally addresses "housing quality requirements," but it "focus[es] on the person regulated rather than the individuals protected."  *Sandoval*, 532 U.S. at 289.  The operative portion reads:

(1) In general

Each contract for contributions for a public housing agency shall require that the agency maintain its public housing in a condition that complies with standards which meet or exceed the housing quality standards established under paragraph (2).

(2) Federal standards

The Secretary shall establish housing quality standards under this paragraph that ensure that public housing dwelling units are safe and habitable. Such standards shall include requirements relating to habitability, including maintenance, health and sanitation factors, condition, and construction of dwellings, and shall, to the greatest extent practicable, be consistent with the standards established under section 1437f (o)(8)(B)(i) of this title. The Secretary may determine whether the laws, regulations, standards, or codes of any State or local jurisdiction meet or exceed these standards, for purposes of this subsection.

(3) Annual inspections

Each public housing agency that owns or operates public housing shall make

> an annual inspection of each public housing project to determine whether units in the project are maintained in accordance with the requirements under paragraph (1). The agency shall retain the results of such inspections and, upon the request of the Secretary, the Inspector General for the Department of Housing and Urban Development, or any auditor conducting an audit under section 1437c (h) of this title, shall make such results available.

42 U.S.C. § 1437d(f). This language focuses exclusively on the relationship between the Secretary and the public housing agency. Although tenants such as plaintiffs are certainly beneficiaries of the inspections and federal standards (as is the Secretary), the statutory provisions fall well short of the clear and unambiguous rights-conferring language necessary to create personal rights enforceable either through § 1983 or through a private right of action.

These conclusions are buttressed by the Sixth Circuit's *Johnson* decision, which also addressed the same issues and analyzed the language of sections 1437, 1437f and 1437d.[10] The *Johnson* court, too, concluded that these sections of the USHA did not create personal rights. *Johnson*, 446 F.3d at 625–27. For the reasons given above, this court comes to the same conclusion and dismisses plaintiffs' claims under the USHA.

**B.     Federal constitutional claims**

Reynolds also appears to raise two federal constitutional claims pursuant to 42

---

[10] These conclusions as to the same sections of the USHA were also reached by Judge Schiller in an opinion that was subsequently vacated as part of a settlement agreement between parties. *See McKinney v. Philadelphia Hous. Auth.*, No. 07-cv-4432, Docket No. 174 (E.D. Pa. April 20, 2010), *vacated after settlement by McKinney v. Philadelphia Hous. Auth.*, No. 07-cv-4432, 2010 WL 2510382 (E.D. Pa. June 16, 2010).

U.S.C. § 1983 in her amended complaint.  Reynolds alleges violations of her Fifth and

Fourteenth Amendment rights "to remain safe and free from harm and to be secure in

their persons from governmental action."  (Am. Compl. ¶¶ 100, 113.)  Reynolds then

alleges that plaintiffs were deprived of "rights, privileges, and immunities guaranteed to

[plaintiffs] as citizens of the United States."  (Am. Compl. ¶¶ 101, 114.)  These bare-

bones and conclusory statements are the only allegations of constitutional violations in the

amended complaint.

Reynolds's Fifth Amendment claim fails because the Fifth Amendment does not

apply to the actions of private entities or the actions of states.  *See Citizens for Health v.*

*Leavitt*, 428 F.3d 167, 178 n.11 (3d Cir. 2005) ("Under the Fifth Amendment, the 'State'

in the state action analysis is the federal government."); *Nguyen v. U.S. Catholic*

*Conference*, 719 F.2d 52, 54 (3d Cir. 1983) ("The limitations of the fifth amendment

restrict only *federal* governmental action and not the actions of private entities."

(emphasis added)).  Instead, any due process protections would only be applicable against

state entities (such as DCHA) through the due process clause of the Fourteenth

Amendment.  *See Leavitt*, 428 F.3d at 178 n.11.  The Fifth Amendment claim will thus be

dismissed.

Reynolds's Fourteenth Amendment claim must be dismissed because the amended

complaint does not set forth sufficient facts to state a constitutional claim distinct from

the statutory claims alleged.  The amended complaint alleges only that DCHA "has

deprived the Plaintiffs of their rights to protection from lead-based paint poisoning . . .

guaranteed by . . . statutes and regulations." (Am. Compl. ¶¶ 103, 116.) Neither

plaintiffs' opposition to the motion to dismiss nor their surreply to the motion to dismiss

contains any mention of the claim or argument in support of the claim. To sustain a a

Fourteenth Amendment claim, plaintiffs must undertake to rephrase the allegations with

specificity sufficient to make out such a claim. The Fourteenth Amendment claim will

thus be dismissed without prejudice.

### C. State law claims

Reynolds raises state law claims against DCHA of two varieties: tort and contract.

These claims will be dismissed as well.

#### 1. Tort claims

DCHA argues that Reynolds's state law tort claims must be dismissed because

DCHA, as a Commonwealth agency, is immune from tort suits under Pennsylvania's

Sovereign Immunity Act, 42 Pa. C.S. § 8521.[11] *See City of Philadelphia v. Lead Indus.*

*Ass'n, Inc.*, 994 F.2d 112, 119 (3d Cir. 1993) ("[B]ecause . . . we are bound to follow the

pronouncement of a state's highest court on an issue of state law, we hold that [a housing

authority] is an agency of the Commonwealth . . . ."); *see also* 35 Pa. C.S. § 1550 ("A[]

---

[11] DCHA is a Commonwealth agency, and not a local agency, and thus Reynolds's citations to Pennsylvania's Political Subdivision Tort Claims Act, 42 Pa. C.S. §§ 8451–52, are not directly on point. However, "[s]tatutes dealing wth governmental and sovereign immunity are to be interpreted consistently" under Pennsylvania law. *Kilgore v. City of Philadelphia*, 717 A.2d 514, 516 n.2 (Pa. 1998).

[housing] Authority shall constitute a public body, corporate and politic, exercising public powers of the Commonwealth as an agency thereof . . . ."). There are only limited exceptions to this immunity—nine forms of negligence claims—which are enumerated in 42 Pa. C.S. § 8522: (1) vehicle liability; (2) medical-professional liability; (3) care, custody, or control of personal property; (4) Commonwealth real estate, highways, and sidewalks; (5) potholes and other dangerous conditions of highways; (6) care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) the administration, manufacture, and use of a toxoid or vaccine.

Because the limited exceptions to sovereign immunity apply to negligence claims only, and not strict liability claims, the two strict liability claims (products liability and ultra-hazardous activity) are barred. Likewise, the claim for intentional infliction of emotional distress is barred because it, too, does not sound in negligence. *See Mitchell v. Luckenbill*, 680 F. Supp. 2d 672, 682 (M.D. Pa. 2010) (Vanaskie, J.). The claim for loss of consortium damages is also dismissed because Pennsylvania does not recognize such a claim for a parent's loss of society and companionship of her child. *Dep't of Pub. Welfare v. Schultz*, 855 A.2d 753, 755 (Pa. 2004). This leaves only the negligence claim among the asserted tort claims.

The only exception that Reynolds's state law negligence claim could arguably fall under is the exception for Commonwealth real estate. This exception allowing for Commonwealth liability applies as follows: the Commonwealth may be liable "and the

21

defense of sovereign immunity shall not be raised to claims for damages caused by . . . [a] dangerous condition of Commonwealth agency real estate and sidewalks, including Commonwealth-owned real property, leaseholds in the possession of a Commonwealth agency and Commonwealth-owned real property leased by a Commonwealth agency to private persons, and highways under the jurisdiction of a Commonwealth agency."[12] 42 Pa. C.S. § 8522(b)(4). The real estate exception, like all exceptions to sovereign immunity, "[is] to be narrowly construed." *Dean v. Commw., Dep't of Transp.*, 751 A.2d 1130, 1134 (Pa. 2000).

The DCHA does not own the subject property, nor does it possess a leasehold in the property. *See* Compl. ¶ 10 ("PBG Enterprises, LLC[,] owned the property . . . ."). Although Reynolds alleges that DCHA was "in the exclusive possession, management and control of the premises,"[13] Compl. ¶ 13, the full extent of DCHA's participation, as alleged in the amended complaint, was as a participant in a Section 8 housing program which was obligated to conduct certain inspections of the property. Pennsylvania courts, however, have ruled that such participation in a Section 8 housing program does not

---

[12] Although the governmental immunity and sovereign immunity statutes are to be construed consistently, there is a key distinction between the respective real property exceptions. Governmental immunity allows for liability for the "care, custody, or control of real property *in possession* of the local agency," 42 Pa. C.S. § 8542(b)(3) (emphasis added), while sovereign immunity allows for liability only where the Commonwealth is the *owner or leasehold owner* of the real property, *id.* § 8522(b)(4).

[13] The amended complaint additionally alleges that PBG and Gallese were also in "exclusive possession" of the premises. (Am. Compl. ¶¶ 11, 12.)

trigger the real estate exception to immunity. *See Prescott v. Philadelphia Hous. Auth.*, 555 A.2d 305, 309 (Pa. Commw. Ct. 1989) (holding that supervisory role of housing authority over real property owned by third parties pursuant to Section 8 did not fall within real estate exception to immunity); *see also Sweeney v. Merrymead Farm, Inc.* 799 A.2d 972, 978 (Pa. Commw. Ct. 2002) ("The essence is not whether the . . . agency actually inspected or failed to inspect the premises, but rather whether inspection amounts to total control or possession."). Here, there are no factual allegations in the amended complaint supporting an inference that DCHA owned or possessed the real property. Far from it, the amended complaint alleges simply that DCHA failed to inspect, warn, remove, or otherwise ameliorate the lead paint on the premises owned by PBG, which is not enough to fall under the real estate exception. *See City of Pittsburgh v. Estate of Stahlman*, 677 A.2d 384, 387 (Pa. Commw. Ct. 1996) ("[B]oth negligent inspection and failure to inspect have been specifically rejected a number of times as giving a[n] . . . agency possession over real property."). Accordingly, the real estate exception does not apply, and the negligence claim will be dismissed because it is barred by sovereign immunity.

### 2. Contract claim

With respect to the contract claim against DCHA, the court declines to exercise jurisdiction over the claim. Because the parties are non-diverse and the claim is a state law claim, the jurisdictional basis for hearing the contract claim would be supplemental

jurisdiction pursuant to 28 U.S.C. § 1367. However, a "district court[] may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(2). Here, all claims over which this court had original jurisdiction have been dismissed. Accordingly, the court will decline to exercise jurisdiction over the contract claim against DCHA; the claim will be dismissed without prejudice.

IV.     **Conclusion**

For the foregoing reasons, defendant Delaware County Housing Authority's motion to dismiss the amended complaint is granted. An appropriate order accompanies this opinion.